IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 120,818

In the Matter of PAMELA J. THOMPSON,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed May 31, 2019. Disbarment.

*Matthew D. Franzenburg*, Deputy Disciplinary Administrator, argued the cause, and *Stanton A. Hazlett*, Disciplinary Administrator, was with him on the formal complaint for the petitioner.

*John J. Ambrosio*, of Morris, Laing, Evans, Brock & Kennedy, Chtd., of Topeka, argued the cause, and *Pamela J. Thompson*, respondent, argued the cause pro se.

PER CURIAM: This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Pamela J. Thompson, of Wichita, an attorney admitted to the practice of law in Kansas in 1985.

On October 3, 2018, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent filed a timely answer to the complaint on October 16, 2018. A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on December 4, 2018, where the respondent was personally present and was represented by counsel. The hearing panel determined the respondent violated KRPC 1.15 (2019 Kan. S. Ct. R. 334) (safekeeping property); 8.4(c) (2019 Kan. S. Ct. R. 387) (engaging in conduct involving dishonesty, fraud, deceit, or

1

misrepresentation); and 8.4(d) (engaging in conduct prejudicial to the administration of justice).

After the hearing, the panel made the following findings of fact and conclusions of law, together with its recommendation to this court:

"*Findings of Fact*

. . . .

"DA12768

"8.     In late 2015, the respondent hired Qualified Plan Solutions (hereinafter 'QPS') to provide administrative services for 401(k) retirement accounts pursuant to a retirement plan established for the respondent and her employees. The respondent was the plan's administrator and trustee. The respondent and her employees, Jackie Brewster and Lora Manny, chose to participate in the plan. By participating, the respondent and her employees agreed to have a portion of their compensation deferred from their paychecks and deposited into the plan account. According to the plan, the respondent was to deposit the salary deferrals into the 401(k) retirement account within seven days. In November, 2015, the respondent approved and signed the plan as the administrator and trustee. The plan went into effect January 1, 2016.

"9.     Beginning January 1, 2016, the respondent withheld funds from her paycheck and from her employees' paychecks. The respondent, however, did not deposit the salary deferrals as required by the plan. The respondent timely deposited the salary deferrals on only one occasion in 2016.

    a.     The respondent failed to deposit any salary deferrals from January 22, 2016, through July 8, 2016. On July 20, 2016, the respondent made a deposit in an effort to make the 401(k) accounts current.

2

b.    The respondent failed to deposit any salary deferrals from July 22, 2016, through December 23, 2016.

"10.    On February 7, 2017, Ms. Brewster and Ms. Manny noticed that their 401(k) accounts were underfunded. In 2016, the respondent withheld $1,653.08 from Ms. Brewster's paychecks in 2016, but deposited less than $800.

"11.    Ms. Manny called Seth Asher, her financial advisor. The respondent overheard Ms. Manny's phone call with Mr. Asher. The respondent said to Ms. Manny, 'don't involve him in this, you'll get me in trouble.'

"12.    On February 8, 2017, Ms. Manny contacted the Kansas Department of Labor regarding the underfunding of the 401(k) accounts. Within an hour of Ms. Manny's phone call, a Kansas Department of Labor employee called the respondent by telephone.

"13.    At some point in time, the respondent contacted her accountant, Sandra Worsham who is also the respondent's cousin, for assistance in resolving the issue with the salary deferrals. Ms. Worsham was able to determine what the respondent needed to deposit to become current.

"14.    In addition to contacting Ms. Worsham, in February, 2017, the respondent also contacted Nick Nowak of QPS to assist the respondent with calculating the amount of the deposit the respondent needed to make to bring the accounts current. The amount included both the salary deferrals and the interest lost as a result of the late payments.

"15.    In mid-February, 2017, the respondent deposited funds in the three 401(k) accounts and brought them current, using a portion of the money converted as described in ¶¶ 21-32, below.

"16.    On February 16, 2017, the respondent told Ms. Brewster and Ms. Manny that she had failed to deposit the amounts which had been withheld from their paychecks into their 401(k) accounts. The respondent apologized to her employees.

3

"17.     Ms. Brewster told the respondent that her husband was an accountant and he wanted to talk to the respondent about the 401(k) issue. The respondent told Ms. Brewster that if that happened, Ms. Brewster would no longer be working in the respondent's office.

"18.     On February 17, 2017, Ms. Brewster filed a complaint with the disciplinary administrator's office against the respondent. During the disciplinary investigation, the respondent admitted that she failed to make timely payments to the 401(k) accounts.

"19.     In order to ensure that the respondent does not again fail to make the proper deposits, the respondent made arrangements with Ms. Worsham to visit the respondent's office at least once a month to assist in all accounting matters relating to the 401(k) accounts.

"20.     On March 10, 2017, Ms. Worsham signed a verification that the respondent had deposited the proper amounts in the 401(k) accounts.

"DA12872

"21      During the investigation of DA12768, Ms. Manny advised the disciplinary administrator's auditor, Larry Pfannenstiel, that the respondent paid herself fees in two estate cases without first obtaining a court order. Ms. Manny also told Mr. Pfannenstiel that the two estate files were missing from the office.

"*Estate of E.I.*

"22.     The respondent drafted E.I.'s will. In the will, the respondent named herself as the successor executor. Following E.I.'s death, on October 27, 2016, a court appointed the respondent to serve as the executor for the estate of E.I. The respondent also served as the attorney for the estate.

4

"23.     The estate had a total value of $72,102.35. While the estate of E.I. was pending, and during the period of one week, the respondent converted $30,365.85 of the estate proceeds, as follows:

    a.     Check 1001, dated February 14, 2017, was made payable to Pamela Thompson, in the amount of 4,865.85. In the memo line, the respondent wrote 'attorney fees.' The respondent deposited the funds into her operating account. The respondent, however, never sought nor received court approval to pay herself attorney fees from the estate account.

    b.     Check 1002, dated February 16, 2017, was made payable to Pamela Thompson, in the amount of $8,250. In the memo line, the respondent wrote '. . . ordered.' The respondent deposited the funds into her operating account. The court did not order this disbursement from the estate account.

    c.     Check 1003, dated February 16, 2017, was made payable to Pamela Thompson, in the amount of $17,250. In the memo line, the respondent wrote 'to Trust for distribution.' The respondent deposited this check into her attorney trust account on February 17, 2017. On February 21, the respondent wrote herself a check out of her trust account in the amount of $17,250 and in the memo line wrote 'attorney fees.' The respondent never sought nor received court approval to pay herself attorney fees from the estate account.

The respondent improperly used these funds for payment of payroll and other expenses related to her law office. Specifically, the respondent used a portion of the funds converted to make the deposits necessary to bring her 401(k) account current and to bring her employees' accounts current. *See* ¶ 15, above.

"24.     On May 10, 2017, the respondent replaced $25,500 of the funds she converted by depositing funds into E.I.'s estate account.

"25.     On May 26, 2017, while the investigation into DA12768 was pending, the respondent self-reported the misconduct in the E.I. probate estate and another probate

5

estate. See ¶¶ 28-32, below. The respondent admitted that while serving as attorney and executor for the estates of two of her clients, she transferred money from her clients' estate accounts to her accounts, without proper authority to do so.

"26.     On June 28, 2017, the respondent replaced the $4,865.85 of the funds she converted by depositing funds into E.I.'s estate account.

"27.     On July 7, 2017, the respondent withdrew as counsel and executor in E.I.'s estate case. On July 12, 2017, the respondent closed the account and provided the proceeds to the new administrator of the estate.

"28.     In the E.I. probate estate, an order admitting will to probate and issuing letters testamentary under the Kansas Simplified Estates Act was filed on October 27, 2016, and the inventory and valuation and the amended inventory and valuation listing the decedent's property were untimely filed in court on June 14, 2017, and June 26, 2017, respectively. This is after conversion and repayment of estate funds.

"*Estate of B.W.*

"29.     The respondent drafted B.W.'s will. Following B.W.'s death, on March 31, 2016, as attorney for B.W.'s estate, the respondent filed a petition to probate B.W.'s will. That same day, the two individuals named in the will each declined to serve as executor and requested that the respondent be appointed to serve as the administrator. The court granted the request and appointed the respondent to serve as the administrator C.T.A. for the estate of B.W.

"30.     The estate had a total value of $58,462.85 and consisted of refunds and assets from the liquidation of multiple stocks. While the estate of B.W. was pending, and during the course of several months, the respondent converted $57,000 of the estate proceeds, as follows:

a.     Check 1002, dated July 7, 2016, was made payable to Pamela Thompson, in the amount of $3,000. In the memo line, the respondent wrote

6

'fees.' The respondent deposited the funds into her operating account. The respondent, however, never sought nor received court approval to pay herself attorney fees from the estate account.

b.      Check 1003, dated September 16, 2016, was made payable to Pamela Thompson, in the amount of $3,500. In the memo line, the respondent again wrote 'fees.' The respondent deposited the funds into her operating account. The respondent, however, never sought nor received court approval to pay herself attorney fees from the estate account.

c.      Check 1004, dated November 11, 2016, was made payable to Pamela Thompson, in the amount of $3,500. In the memo line, the respondent wrote 'executor.' The respondent deposited the proceeds into her operating account. Again, the respondent never sought nor received court approval to pay herself executor fees from the estate account.

d.      Check 1006, dated January 6, 2016, was made payable to Pamela Thompson, in the amount of $28,500. (Even though the check is dated January 6, 2016, it is clear that the check was written in 2017, as B.W. did not pass away until March, 2016.) In the memo line, the respondent wrote 'to trust account.' The respondent deposited the funds into her trust account on January 9, 2017, and withdrew the funds on January 13, 2017. The respondent asserted that she deposited the funds in her operating account.

e.      Check 1007, dated February 13, 2017, was made payable to Pamela Thompson, in the amount [of] $18,500. In the memo line, the respondent wrote 'to trust for disbursements.' The respondent deposited this check into her attorney trust account and shortly thereafter transferred the funds to her operating account.

The respondent improperly used these funds for payment of payroll and expenses related to her law office. Specifically, the respondent used a portion of the funds converted to

7

make the deposits necessary to bring her 401(k) account current and to bring her employees' accounts current. *See* ¶ 15, above.

"31. The respondent replaced the funds she took from B.W.'s estate account. At the hearing on this matter, the respondent testified that she borrowed money from a bank and from friends to pay the two estates back.

a. On June 28, 2017, the respondent replaced $42,000 by depositing funds into B.W.'s estate account.

b. On July 20, 2017, the respondent replaced $5,000 by depositing funds into B.W.'s estate account.

c. According to the respondent, on January 18, 2018, the respondent replaced $9,500 by depositing funds into B.W.'s estate account. The bank records introduced into evidence do not include January, 2018.

d. On October 31, 2018, the respondent replaced the final $500 of the funds she converted by depositing the funds into B.W.'s estate account.

"32. On May 30, 2018, the respondent filed a motion to withdraw as executor and attorney in B.W.'s estate case. The court granted the motion and appointed an administrator in the respondent's place.

"33. In the B.W. estate, an order admitting will to probate and issuing letters of administration *cum testamento annexo* was filed on March 31, 2016, and the inventory and valuation and the amended inventory and valuation listing the decedent's property were both untimely filed in court on September 7, 2017. This was after conversion and repayment of estate funds.

"34. The respondent claimed that she earned certain fees in the two estate cases. While the respondent testified that she provided her time statements in the two estate cases to the disciplinary investigator, there is no documentary evidence before the

8

hearing panel to establish that what she earned coincided with what she stated she had earned. While this would have more significance had she retained some portion of the money as fees, the lack of evidence leaves the hearing panel wondering whether the respondent's statements in her July 17, 2017, letter provided during the disciplinary investigation are truthful:

> '3. I [*sic*] February 26, 2017, I billed the estate for my work completed to that point in the amount of $4,865.85, and wrote a check to myself in that amount. I intended to seek approval from the Court for that payment.

> . . . .

> '3. On July 7, 2016, I wrote a check for fees in the amount of $3,000.00. On September 19, 2016, I wrote a check for fees in the amount of $3,500.00. On November 15, 2016, I wrote a check in the amount of $3,500.00 for fees. These were based on time spent working on the estate. I intended to seek approval of the court as interim fees.'

The hearing panel reviewed the estate files and found the estates to be simple and straightforward. The hearing panel questions the veracity of the respondent's statements in her July 7, 2017, letter based on the amount of claimed fees in relation to the complexity of the estates, the amount of work completed to date, and the total value of each estate. The respondent's claimed fee in the E.I. estate constitutes 6.7% of the estate ($4,865.85 divided by $72,102.35). The respondent's fee did not include costs associated with the final settlement of the estate. Additionally, the respondent's fee in the B.W. estate constitutes 17% of the estate ($10,000 divided by $58,462.85). Again, the respondent's interim $10,000 fee did not include fees associated with the final settlement of the estate.

9

"35.     In the parties' amended joint stipulation, the respondent admitted that she violated KRPC 1.15, KRPC 8.4(c), and KRPC 8.4(d). Based upon the stipulation and the above findings of fact, the hearing panel concludes as a matter of law that the respondent violated KRPC 1.15 (safekeeping property) and KRPC 8.4 (professional misconduct), as detailed below.

## "KRPC 1.15

"36.     Lawyers must keep the property of their clients and third parties safe. *See* KRPC 1.15. In this case, the respondent failed to properly safeguard the estate funds when she converted the funds to her own purposes. The hearing panel concludes that the respondent failed to safeguard property in violation of KRPC 1.15.

## "KRPC 8.4(c)

"37.     'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' KRPC 8.4(c). The respondent engaged in conduct that involved dishonesty when she withheld funds from her employees' paychecks but did not deposit those funds into the 401(k) accounts. The respondent wrote herself eight checks drawn on two estate accounts and converted a total of $87,365.85 of estate property. The respondent used those funds for her own purposes, including making payroll and funding her own 401(k) account. The hearing panel concludes that the respondent repeatedly violated KRPC 8.4(c).

## "KRPC 8.4(d)

"38.     'It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice.' KRPC 8.4(d). The respondent engaged in conduct that was prejudicial to the administration of justice when she paid herself for

attorney fees without seeking and obtaining court approval for the payment of fees. As such, the hearing panel concludes that the respondent violated KRPC 8.4(d).

"*American Bar Association*
*Standards for Imposing Lawyer Sanctions*

"39.    In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"40.    *Duty Violated*. The respondent violated her duty to her clients and third parties to properly safeguard property, the respondent violated her duty to the public to maintain her personal integrity, and the respondent violated her duty to the legal system to refrain [from] engaging in acts that are prejudicial to the administration of justice.

"41.    *Mental State*. The respondent knowingly and intentionally violated her duties.

"42.    *Injury*. As a result of the respondent's misconduct, the respondent caused potential injury to her employees, potential injury to the heirs of the two estates, and actual injury to the legal profession.

"Aggravating and Mitigating Factors

"43.    Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

11

a.  *Dishonest or Selfish Motive*. The respondent's misconduct was motivated by dishonesty and selfishness. It is dishonest to take another's property without proper authority. The respondent testified that she knew taking the money was wrong. She took the funds as her income was not sufficient to pay bills. She then borrowed money from family and friends to repay the estates. Given further testimony, it is clear that the respondent and her husband had sufficient joint resources to pay expenses to begin with or, subsequently, to repay the estates without borrowing money from family and friends. Additionally, taking funds from an estate to pay your bills is selfish. Accordingly, the hearing panel concludes that the respondent's misconduct was motivated by dishonesty and selfishness.

b.  *A Pattern of Misconduct*. The respondent repeatedly failed to deposit salary deferrals to the 401(k) accounts. The respondent wrote eight checks drawn on two estate accounts and converted $87,365.85 to her own use. As such, the respondent engaged in a pattern of misconduct.

c.  *Submission of False Evidence, False Statements, or Other Deceptive Practices During the Disciplinary Process*. The respondent stipulated to the facts included in ¶ 17 above. However, at the hearing on this case, the respondent told a different story. The respondent testified that she knew that Ms. Brewster's husband had previously threatened someone and when Ms. Brewster said that her husband wanted to talk to the respondent, the respondent took that statement as a threat. The disciplinary administrator relied on the respondent's stipulation and was not in a position to dispute the respondent's altered version of the stipulated facts. The hearing panel finds that the respondent's testimony contrary to the stipulation is deceptive.

d.  *Vulnerability of Victim*. The respondent's employees and the two estates were vulnerable to the respondent's misconduct.

12

e. *Substantial Experience in the Practice of Law*. The Kansas Supreme Court admitted the respondent to practice law in the State of Kansas in 1985. At the time of the misconduct, the respondent has been practicing law for more than 30 years. The letters in support of the respondent indicate that she has been a good and effective attorney for her clients.

f. *Illegal Conduct, Including that Involving the Use of Controlled Substances*. The respondent converted money that was entrusted to her. Specifically, the respondent took $87,365.85 from two estate accounts without authorization. The respondent's actions appear to satisfy the elements of theft. *See* K.S.A. [2018 Supp.] 21-5801(a)(1). Based on the amount of money taken from each estate, the respondent's conduct could be classified as two counts of theft, level 7 nonperson felonies. *See* [2018 Supp.] K.S.A. 21-5801(b)(2). Additionally, the respondent withheld funds from her employees' paychecks and failed to deposit those funds into the 401(k) account for an extended period of time. Retaining her salary deferrals could also constitute theft.

"44. Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

a. *Absence of a Prior Disciplinary Record*. The respondent has practiced law for 33 years and has not previously been disciplined.

b. *Personal or Emotional Problems if Such Misfortunes Have Contributed to Violation of the Kansas Rules of Professional Conduct*. The respondent suffers from depression and anxiety. This was caused in part [by] a number of real stressors in her life beginning with the respondent's father's dementia and his resulting anger, in turn causing anxiety between her parents and her husband; conflict with employees in her office; two distressing incidents with dear friends (described below), and thereafter her mother's stroke in August, 2017, leaving the respondent as a caregiver to her father. Additionally, the

13

respondent previously suffered from acute stress disorder after discovering a good friend suffering from a grave medical condition. A few days later, the respondent's good friend died. Also, in July 2016, one of the respondent's long-time friends was diagnosed with a terminal condition. While the respondent suffers from personal and emotional problems, it is difficult to link the problems to the dishonest conduct in this case. The respondent presented the testimony of Renee Fields, LSCSW. Ms. Fields testified that the respondent was in a fog when she failed to properly fund the 401(k) accounts and that she was also in a fog each time she wrote the checks out of the estate accounts and the respondent's emotional problems caused the misconduct. The hearing panel questioned Ms. Fields about the link between the personal and emotional problems and the misconduct. Ms. Fields testified that based on her experience in the field she 'knew' that the personal and emotional problems caused the misconduct. Ms. Fields also testified that the respondent's condition and anxiety made exercising judgment a problem and the respondent did not see her choices. The hearing panel did not accept this testimony. The hearing panel concludes that the respondent failed to present sufficient evidence to establish that the respondent's personal and emotional problems contributed to or caused the respondent's repeated dishonest conduct. While the hearing panel agrees that the respondent had significant stress, depression and anxiety in 2016 and 2017, the hearing panel cannot overlook the respondent's testimony, which was received prior to Ms. Fields' testimony, that the respondent knew her conduct was wrong.

c. *Timely Good Faith Effort to Make Restitution or to Rectify Consequences of Misconduct*. The respondent has repaid the salary deferrals and interest into the employees' 401(k) accounts. Additionally, the respondent repaid the $87,365.85 to the estates.

14

d.      *The Present and Past Attitude of the Attorney as Shown by His or Her Cooperation During the Hearing and His or Her Full and Free Acknowledgment of the Transgressions.* The respondent fully cooperated with the disciplinary process. Additionally, the respondent admitted the facts that gave rise to the violations.

e.      *Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney*. The respondent is an active and productive member of the bar of Wichita, Kansas. The respondent also enjoys the respect of her peers and generally possesses a good character and reputation as evidenced by several letters received by the hearing panel.

"Additionally, the respondent's pastor, George Skramstrand, testified that he has known the respondent since 1991 and that he has counseled her as to her recent struggles, depression, and anxiety. He testified that she has 'owned her actions' and is remorseful and understands the magnitude of her actions.

"The Honorable James Burgess, appearing under subpoena, has known the respondent for a considerable period of time as a former judge in the juvenile department in Sedgwick County, Kansas. He trusted her work and honest opinion and noted the compassion she displayed for clients. She was also previously trusted to serve as a *pro tem* judge. Judge Burgess also testified that her conduct as charged in this case is inconsistent with the person he has known the respondent to be.

"45.     In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'4.11    Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client.

15

'4.12    Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client.

'5.11    Disbarment is generally appropriate when:

(a)    a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the sale, distribution or importation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses;

(b)    a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that serious adversely reflects on the lawyer's fitness to practice.

'7.1    Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system.

'7.2    Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.'

16

"46.    The disciplinary administrator recommended that the respondent be disbarred. The respondent testified that a period of suspension was appropriate in this case and counsel for the respondent recommended that the hearing panel recommend that she be suspended for a period of one year.

"47.    The facts detailed above establish that the respondent engaged in a pattern of dishonest conduct. The serious nature of the respondent's misconduct warrants disbarment. Additionally, the ABA Standards clearly support disbarment in this case. However, the facts detailed above, also establish that the respondent made all four of her victims whole. Accordingly, based upon the findings of fact, conclusions of law, and the Standards listed above, a majority of the hearing panel recommends that the respondent be indefinitely suspended.

"48.    Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator.

 . . . .

"<u>CONCURRING AND DISSENTING OPINION</u>

"I concur in the findings of fact, the conclusions of law, and the consideration of the ABA Standards. I respectfully dissent as to the recommendation. Disbarment is the appropriate discipline in this case.

"By the testimony presented and exhibits introduced, the respondent has enjoyed a productive and well-respected legal career since 1985. The respondent has made significant contributions to her church, community, and the legal profession. The respondent has weathered the challenges of private practice for over 33 years without complaint and incident and enjoyed the privileges of representing clients in an excellent manner.

"It is clear that in 2016 and 2017, the respondent suffered from depression and anxiety resulting from a number of significant stressors in her life as detailed by the majority opinion. However her legal business also began to suffer cash flow issues during this time frame. The pattern of misconduct began in response to those financial issues. The respondent withheld 401k contributions from her employee's checks, yet failed to timely deposit the salary deferrals in most months of 2016 and early 2017. The funds were instead used for the respondent's own purposes.

"Additionally, the respondent knowingly and intentionally and without court authority wrote herself eight checks drawn on two estate accounts for a total of $87,365.85. She was a fiduciary in these estates. She then personally used these funds and wrote numerous words such as 'attorney fees,' 'ordered,' 'to trust for distribution,' 'fees,' 'executor,' 'to trust account,' 'to trust for disbursement,' on the check memos to apparently justify or mask her deeds. Moreover, the respondent testified that she knew her conduct was wrong.

"There was no inventory or accounting timely filed with the district court by the respondent which demonstrated the initial deposits of assets in the two estates, nor showed the disbursements of funds to the respondent or her repayment.

"Perhaps the most confounding fact is that the respondent testified that she had sufficient joint assets with her husband to secure financing to avert the conduct which has occurred in this case.

"The respondent cooperated with the disciplinary administrator's office and has fully repaid her obligations. She demonstrated genuine remorse and regret at the hearing. The respondent acknowledged her conduct and has done all she can do to 'right her wrongs,' yet notwithstanding, I find that Standards 5.11 and 7.1 provide that the appropriate discipline, given all the facts and consideration of mitigating and aggravating evidence, is disbarment."

DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, the discipline that should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f) (2019 Kan. S. Ct. R. 257). Clear and convincing evidence is "'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

The respondent was given adequate notice of the formal complaint to which she filed an answer. The respondent was also given adequate notice of the hearing before the panel and the hearing before this court. She did not file exceptions to the hearing panel's final hearing report.

With no exceptions before us, the panel's findings of fact are deemed admitted. Supreme Court Rule 212(c), (d) (2019 Kan. S. Ct. R. 261). Furthermore, the facts before the hearing panel establish by clear and convincing evidence the charged misconduct in violation of KRPC 1.15 (2019 Kan. S. Ct. R. 334) (safekeeping property); 8.4(c) (2019 Kan. S. Ct. R. 387) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); and 8.4(d) (engaging in conduct prejudicial to the administration of justice). The evidence also supports the panel's conclusions of law. We therefore adopt the panel's findings and conclusions.

The only remaining issue before us is the appropriate discipline for the respondent's violations. At the hearing before this court, the office of the Disciplinary

19

Administrator continued to recommend that the respondent be disbarred. The respondent and her counsel requested suspension for one year.

This court is not bound by the recommendations made by the Disciplinary Administrator or the hearing panel. Supreme Court Rule 212(f). But, in this case, we agree with the Disciplinary Administrator and the concurring and dissenting hearing panel member. Respondent's misconduct was too serious, and her initial efforts to avoid detection of it too plain, to persuade us that she should receive a lesser sanction.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Pamela J. Thompson be and she is hereby disciplined by disbarment in accordance with Supreme Court Rule 203(a)(1) (2019 Kan. S. Ct. R. 240), effective on the date of the filing of this opinion.

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.